Good morning. My name is Andy Nelson. I represent the defendant and appellant Tina Cote in this case. The issue presented on appeal is whether the District Court erred when it concluded that the Confederated Salish and Kootenai Tribe is the victim of Ms. Cote's offense of embezzlement from a tribal organization within the meaning of the statute 18 U.S.C. 1163. In reaching that conclusion, the District Court also erroneously, in our view, invoked the doctrine of intended loss. Our argument on appeal turns on the legal significance of facts that were admitted and not contested in the pre-sentence report. In preparing the pre-sentence report, the United States Probation Office learned that the tribe reported that it had suffered no loss as a result of the scheme for which Ms. Cote and her co-defendant were indicted and convicted. If the individuals had not been able to repay, what would have happened? In that case, Your Honor, the intended loss doctrine may have applied. I'm asking factually, if the individuals had not repaid, would the financial loss have fallen on the tribe or on the individuals? I believe it would fall on the individuals. I don't know that the record informs that answer. But those individuals, those loans were enforced like any other loan that the tribe tribal credit issues. Those individuals, at the moment the funds were transferred, had a legal obligation to repay those loans, an obligation the tribe continues to enforce to this day. And at the second sentencing hearing, there was testimony that there are built-in mechanisms for the tribe to collect on those loans. The tribe is a very unique organization. They can withhold per capita distributions of the tribal members. All of the alleged victims, I'm sorry, all of the individual people who took out loans in this case were tribal members. And each and every loan has been collected on to this, as of the date of the second sentencing hearing, which is the last date the record encompasses. The significance of individual tribal members being held responsible to repay these loans is that there's a layer of individuals between Miss Cody and the tribe. This is not a major Crimes Act case. Therefore, federal jurisdiction is dependent on application of the statute, 18 U.S.C. 1163. Because of the tribe's uncontested admission, there's no longer a tribal organization that can properly be considered the victim of this offense. And for that reason, Miss Cody has raised a challenge to federal subject matter jurisdiction, a claim that can't be waived, that can be raised at any time, and can even be raised sui sponte. The other primary issue I'd like to address today is the doctrine of intended loss. Our position, and a position that was probably not as well articulated in the briefs as it could have been, is that that doctrine is a sentencing idea that goes to amount of loss, not to the identity of the victim. Where you have a record that shows that other individuals are responsible for repaying a loan, that those obligations are being enforced, that those obligations are being satisfied, and that those individuals are the real victims of this offense. It's our position that the court erred in applying the doctrine of intended loss. Well, it seems like you're just making the same argument again, that it's not the tribe that is the victim. It's the individuals who obtain the money that are the victims. It seems to me your intended loss argument is the same as your first argument. What is the difference between the two? The difference between the two, Your Honor, is that I suppose one is just a more specific articulation of the other. The district court relied on the doctrine of intended loss. But your point is, whether it's right or wrong, that it's not the tribe that suffers the loss of the act of the defendant. It's the individuals who borrowed the money from the tribe. That's correct. Who suffer the loss. That's your point, which goes to whether there's a loss to the tribe or whether there's a violation of the statute or whether we have jurisdiction, whatever your argument happens to be at the moment. But I don't see what it has to do with intended loss. I don't think you can, in this case, Your Honor, the inquiry of who's the victim I think depends on the district court's logic, which was that the tribe is the victim because the loss was intended. I understand that argument, that under the statute, she has not embezzled, stolen, converted to her use money of the tribe. That's your basic argument, I understand. Correct. Okay. But I don't understand what the separate argument is about intended loss. I believe there are some cases, not this case, where you could have a victim of 18 U.S.C. 1163 that experienced no loss. That's not the case here. Okay. All right. Do you want to save your time for rebuttal or do you want to bring it to a close? If the panel has no further questions, I will preserve this time for rebuttal. Good morning, Your Honors. May it please the Court, my name is Carl Rostand. I'm with the U.S. Attorney's Office in Great Falls. I was not counsel in the lower court, but I was committee counsel for appeal. In this particular instance, Your Honors, let's start with the jurisdictional argument. Ms. Cody cites Cotton in the U.S. Supreme Court case for the proposition, rightfully so, that jurisdiction is never waived. But if you read the rest of Cotton, what she seeks in Cotton for her rule of law also defeats her argument here because Cotton made clear that jurisdiction, at least in this day and age, is not an elastic concept. It only goes to the court's power to entertain a particular prosecution. And obviously, in this case, 1163 is a federal law cognizable by the district courts in any sort of prosecution. If Ms. Cody had wanted to preserve the argument that she did not steal from the tribe, but instead defrauded all of these agent borrowers that she'd employed to get the money out of the tribe, then she should have gone to trial and tried to convince a jury that the tribe was not the victim. It's our position, of course, the tribe is the victim, and it ties into the loss argument as well because if you follow the money, she was working at the credit union. She goes out and finds these borrowers who have no interest in borrowing money or repaying it. She tells them they don't have to repay it. And if you go from the back way forward, you'll see how this distinguishes from the pigeon drop cases that are also discussed. Well, I understand how, from a practical standpoint, the tribe ultimately may lose money. But from a statutory standpoint, the question is, did she embezzle, steal, or knowingly convert to her use property of the tribe? And then the question is, when the tribe loaned the money to these individuals and she then defrauded the individuals of the money, was that tribal property she was taking? And that, Your Honor, could certainly be her theory of defense. Our theory of the prosecution, however, is that the distinction, again, in those old pigeon drop cases where they said it wasn't bank fraud because the depositor went to the bank, got his money out, and then gave it over to the con man, in this case, the distinguishing factor is you're not dealing with depositors. You're dealing with borrowers. Well, I understand that there's a difference between this case and that case, but, you know, so what? What's the answer to their argument? The answer is that they didn't take property of the tribe. They took money that was then the property of the borrowers. The answer is, Your Honor, is that the borrowers are not true borrowers. They are agents of Miss Cody because she has told them they don't have to repay. And when the dollar goes back, let's say restitution in this case, which is some $43,000, is given back to the credit union, then that credit union will be made whole. However, if you gave it back to the agents of Miss Cody in the middle, they don't have to pay her back, and the credit union would then still be without any money. So that's if you follow the money, you find out who the true victim is. Counsel, I have a question, too. It turns out that people did pay back these loans, or at least the record shows that they did or that they will. If they couldn't, what would happen as a factual matter as far as the record shows? Would the tribe be out the money, or would the individuals be out the money? Well, if you go on a legal theory that they always owe it, but I mean it's like in the practical sense, it would be a bad loan. They would either have to write it off or execute against property, or if there was any property to be executed against. So if the money were not in fact paid back, the tribe would actually lose money in a realistic sense. Yes, ma'am. And I think that it's telling that these people are not willingly paying back the money. The money is being paid back by the tribe not giving them their per capita payments, which are the yearly receipts that each individual tribal member gets from tribal leases and mining and logging and that sort of thing. So it's not like these folks are genuinely paying the money back. They're not voluntarily paying it back. No, sir. But the tribe has no real risk of any loss because these people are all entitled to tribal payments on a regular basis that the tribe can, as you say, and does, take as repayment. Provided that the per capita payments, Your Honor, can meet the payment. And I don't know. That was never developed in the record that I saw as far as it might be an interest only, it might be a partial payment that the tribe is willing to accept. There's a whole world of things. You mean you haven't established what the loss actually is or was intended because nobody's shown how much? No. I mean it seems to be agreed that every period, whatever, every one of these people is entitled to tribal payments, which the tribe is entitled to seize for repayment of the loan. Yes. And you say the record doesn't tell you to what extent, if any, the tribe is at risk in light of these payments? The record wasn't developed, Your Honor, to say that the payments are sufficient in every case to match the. . . Or not sufficient. Or not sufficient. Yes, Your Honor. And then the record isn't developed to show the loss? The record isn't sufficient, Your Honor, to show. . . We argued that the intended loss was every time she used it as a nominee that didn't intend to take out a loan, that was the loss. And that's what we argued was that the loss should have been more like $100,000. Judge Malloy fixed it at some $43,000. So we believe there was enough evidence in the record to ascertain what the loss would have been. It wasn't our figure. It was a compromise figure. The figure of $43,700-and-some-odd has either side challenged the accuracy of that as distinct from the theoretical question of whose loss it was. In other words, that's the restitution amount. And is there any challenge just to the accuracy of the number at this point? Not that I've seen, Your Honor, other than Mr. Nelson's challenge that there should be zero loss. Right. But I read that as theoretical rather than the identity of the dollar number. No. There was no other calculation than the one the government offered, which was the composite of all the loans and the one that the defendant argued, which was zero. So the question really is, is that $43,000 an intended loss to the tribe or not? And so it's either 43 or zero, but there's not like 22. There's no other numbers, Your Honor. If the Court has no other questions, I'll turn it back over to Mr. Nelson. Thank you, Gary. Thank you. I would just respond briefly to one issue raised by Mr. Rosted, and that was his assertion that if Ms. Cote wanted to contest these facts that she should have gone to trial. I would just say there are two principles that really deal with that idea. The first is that subject matter jurisdiction, as argued in the briefs, is different than most arguments. It can be raised at any time. It can't be waived. The second principle is the law of the circuit is that you can't be forced to withdraw your plea and go to trial. Ms. Cote fled to the facts alleged at the time they were alleged, and then after her plea, much to everyone's surprise, the government's witness, an alleged victim, stated that they were enforcing these loans, that they were going to make these people pay them back. And that's when the playing field changed, and so the law just does not support that. I don't understand why that changes it, because if she conceded, she said in her plea colloquy these were tribal monies and I took them. I've essentially conned people into funneling tribal money to me. And whether the tribe recoups it or not, I don't understand how that changes her intention as to what the loss was going to be. Because the question is what she intended. She didn't care if the tribe recouped the money or not at the time she took it. Well, I don't know that the record speaks to that, Your Honor. I would say that that plea colloquy is rather vague. These are tribal monies, she says, yes, they were at one point, and then they became the property of the individual victim. Well, I guess my question to you, you said, well, everything changed because the tribe decided to try to cut down on its losses by recouping some of this money, but I don't understand why that changes the nature of the crime at the time that it occurred. Well, the essence of her argument, Your Honor, is that the tribe is therefore no longer a victim within the meaning of the statute, and therefore there's no federal jurisdiction. So if someone robs me personally at gunpoint and the police manage to catch them and get them to pay me back, I'm no longer a victim because I got my money back? Well, I'm not sure that analogy holds, Your Honor, because in this case there's a layer of individuals between the tribe and Miss Cody who are legally responsible to repay these loans. I think you keep combining several different arguments into one, and the intent, I don't see any relevance to what her intent was. Obviously, somebody who's got a gambling problem, who borrows money, or steals money, diverts money, whatever she does, always believes they're going to win. They borrow the money, they're going to pay it back next week. She doesn't expect that in the long run the bank's going to lose or the people are going to lose. She thinks she's going to be a big winner and everybody's going to get paid back, but that has nothing to do with whether she's committed an offense in taking the money and whether the tribe actually gets paid back, and that also has nothing to do with whether she committed an offense. The question is whether when she did what she did she was taking tribal money or whether she was taking the money of the individuals who had borrowed from the tribe. At least as far as I can see, that seems to be the only question here. I would agree that that's the most pressing issue, Your Honor. I would say that it's hard to discern from the record what her intent is. Well, her intent was to get the money to use for gambling, and whether she was taking money from the tribe or from the individuals is really a legal question, isn't it? Judge, we've never disputed that there is an offense here. We just argue on appeal that it's not this offense. Yes, well, that's the question. Is the offense taking money from the tribe, which is a violation of one statute, or is it defrauding and taking money from the people who got the money from the tribe? If it's the first, then she's guilty of the offense and the sentence is proper. If it's the second, then maybe she's not guilty of that offense but guilty of a different one. Is there any other question other than that in this case? I believe that's the primary issue on appeal, Judge. All right. Thank you, counsel. Thank you. Case just argued will be submitted. Next case for argument is
judges: Reinhardt, Graber, Lew